DAVID W. SCOFIELD - 4140
THOMAS W. PETERS- 8856
**PETERS | SCOFIELD**
*A Professional Corporation*
7430 Creek Road, Suite 303
Sandy, Utah 84093
Telephone:   (801) 322-2002
Facsimile:   (801) 322-2003

Attorneys for Plaintiff

---

## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF UTAH

---

| | |
|---|---|
| **MICHAEL E. ANDERER**, <br><br> Plaintiff, <br><br> -vs- <br><br> **INAURA, INC.**; **PETER BOOKMAN**; **RODNEY A. RASMUSSEN**; **DAVID M. MOCK**; **DAVID G. TURCOTTE**; and **V3 SYSTEMS, INC.**, <br><br> Defendants. | **COMPLAINT** <br><br><br> Case No. _____ <br><br> Honorable _____ <br><br> **JURY TRIAL DEMANDED** |

Plaintiff Michael E. Anderer, by and through his counsel of record, for his claims

against the Defendants Inaura, Inc., Peter Bookman, Rodney Rasmussen, David Mock,

and David Turcotte, alleges as follows:

### PARTIES

1.      Plaintiff Michael E. Anderer ("Anderer") resides in and is a citizen of the

state of Florida. Anderer is and at all material times was one of two members of Inaura

Holding, LLC ("Holding"), a Utah limited liability company. With respect to claims

involving Holding, pursuant to UTAH CODE ANN. § 48-2c-1701, Anderer has the right to

bring this action in his name on behalf of Holding because it is also brought against the sole other member and Anderer is the proper party plaintiff pursuant to UTAH CODE ANN. § 48-2c-17012.

2.       Defendant Inaura Inc. ("Inaura") is a Delaware corporation formed on or about June 8, 2007. Inaura is registered to do and has done since at least October 16, 2008 business in Utah and Inaura's principal place of business and business headquarters has been and is in Utah. Inaura is therefore a citizen of the states of Delaware and Utah. At all relevant times, Inaura was a closely-held, non-public corporation controlled by Rasmussen and Mock and Anderer was at all material times a minority shareholder of Inaura.

3.       Defendant V3 Systems, Inc. ("V3") is a Nevada corporation. V3 was incorporated on or about September 3, 2010, and has been authorized to do and has been doing business since September 27, 2010 in Utah and V3's principal place of business and business headquarters has been and is in Utah. V3 is therefore a citizen of the states of Nevada and Utah. V3 is in the business of providing a hardware platform to host virtual desktops and virtual desktop management tools.

4.       Defendant Peter Bookman ("Bookman") resides in and is a citizen of the state of Utah. Bookman is and at all material times was one of two members of Holding. Bookman was a co-founder, president, director, and CEO of, and registered agent for, Inaura. Bookman later became the president, chief executive officer and a member of the Board of Directors of V3.

5.       Defendant David M. Mock ("Mock") resides in and is a citizen of the state of Utah. Mock was a director of Inaura and, in a voting block with Rasmussen, Mock and Rasmussen controlled Inaura. Mock is currently a director of V3.

6.      Defendant Peter Bookman ("Bookman") is the president and chief executive officer of V3. Bookman is a director of V3. Prior to joining V3, Bookman had been a co-founder, president, director, and CEO of Inaura. Bookman joined Inaura in August 2010. Bookman was the registered agent for Inaura. Bookman also was a member of Holding and owned fifty percent (50%) of that company. Anderer owned the other fifty percent (50%).

7.      Defendant Rodney Rasmussen ("Rasmussen") is a co-founder and current chief financial officer of Defendant V3.  Rasmussen is a director of Defendant V3. Prior to joining Defendant V3, Rasmussen was the Chief Financial Officer for Inaura and also had been a director of and the registered agent for Inaura. Rasmussen resides in and is a citizen of the state of Utah.

8.      Defendant David Turcotte ("Turcotte") is the current chief operation officer or executive vice-president of sales for V3. Turcotte also is the secretary and the registered agent for V3. Turcotte held himself out to be a director of Defendant Inuara.

**JURISDICTION AND VENUE**

9.      Anderer is a citizen of the state of Florida. As shown above, none of the defendants is a citizen of the state of Florida, but instead are citizens of one or more of the states of Delaware, Utah and Nevada. Therefore, complete diversity of citizenship exists as between all plaintiffs, on the one hand, and all defendants, on the other hand.

10.     The matter in controversy in this action exceeds the sum or value of $75,000, exclusive of interest and costs.

11.     This Court therefore has original jurisdiction over this civil action by virtue of the provisions of 28 U.S.C. § 1332.

12.     The court has jurisdiction over the claims relating to the Copyright Act, 17

U.S.C. § 101 et seq. and the Lanham Act, 15 U.S.C. § 1125, et seq. pursuant to 28

U.S.C. § 1331 (federal subject matter jurisdiction) and 28 U.S.C. § 1338(a) (acys of

Congress relating to copyrights).

13.    The court has jurisdiction over the federal 10b-5 claim securities fraud

claims pursuant to 28 U.S.C. § 1331 (federal subject matter jurisdiction).

14.    Venue is proper in this District pursuant to  28 U.S.C. § 1391(b)(1) in that

all defendants reside in this district, and pursuant to 28 U.S.C. § 1391(b)(2) in that a

substantial part of the events or omissions giving rise to the claims occurred in this

district.

**FACTUAL BACKGROUND**

15.    Holding was initially formed on or about August 31, 2007 by Anderer and

Bookman, each owning 50% of the membership interests in Holding.

16.    Among other things, the business of Holding was to develop and market a

small, portable security device which could be attached to a computer with access to

the internet. The security device would scan the user's thumb print and would then allow

a user to access secure programs, applications, documents and data.

17.    At or about the time of Holding's formation, Anderer had been recruited by

Bookman to become involved with Holding as Holding's Chief Technology Officer

("CTO") in order to help Holding successfully develop its products.

18.    Bookman's primary responsibility at Holding was to raise funds for

securing patents related to Holding's technology and to fund operations. Bookman also

was at all times relevant herein Holding's registered agent.

19.    Anderer was to have been paid by Holding for all services he provided to

Holding.

20.     Not only was Anderer not paid for his services, but Anderer also provided funding to Holding of over $300,000.00 and funding to Bookman directly, when Holding ran out of funds and Bookman was unwilling to provide or raise any other funds.

21.     The over $300,000 provided by Anderer to Holding and Bookman was used to provide Bookman money for living expenses and to pay Holding's engineers who continued to develop Holding's products, patents, intellectual property and trade secrets.

22.     Holding's accrued but unpaid over $300,000 in unpaid salary obligations to Anderer.

23.     In or about May and June 2007, discussions were held among Anderer, Bookman, Rasmussen, and Mock regarding the formation of Inaura. During those discussions, various agreements were made among those parties including the following:

        a.      Holding, whose equal owners were Anderer and Bookman, was to receive two million (2,000,000) shares of Inaura stock which would represent approximately fifty percent (50%) of the outstanding shares of Inaura. Mock had a small percentage ownership interest, i.e. less than five percent (5%)). An entity owned or controlled by Rasmussen was to own the remaining shares.

        b.      Bookman was to be the Chief Executive Officer of Inaura. Anderer was to be the Chief Technology Officer of Inaura. Rasmussen was to be the Chairman of the Board of Directors of Inaura.

        c.      Bookman and Anderer also were to be members of the Inaura Board of Directors along with another director that Rasmussen was to choose, and one other individual who was to be "independent" of the principals of Holding

as well as of Rasmussen and Mock.

       d.    The Parties were to agree upon a set of benchmarks or

"milestones" which Inaura was to reach within the first year of operation.

     24.    On or about June 7, 2007, Inaura was formed, and its incorporation

papers filed with the Delaware Secretary of State's office.

     25.    The business of Inaura was to provide hardware-based security and

biometric user identification for use primarily in virtualized computing environments. A

user of Inaur's devices would allow that user to connect the device to a web-connected

host machine after the device verified the user's identity. It would then allow the user to

connect to the user's applications, servers, and data via a virtual desktop. Inaura's

devices would allow secure connection and access to data by persons and only those

persons authorized to view such information.

     26.    In or about August 2007, and consistent with the prior agreement

described above, Inaura adopted its Bylaws. The Bylaws provided in relevant part:

> 1. 3 **Special Meeting**. A special meeting of the stockholders may be
> called at any time by the Board, Chairperson of the Board, Chief Executive
> Officer or President (in the absence of a Chief Executive Officer) or by one
> or more stockholders Holding shares in the aggregate entitled to cast not
> less than 10% of the votes at that meeting.
> ….
>
> 2.2 **Number of Directors.** The Board shall consist of an odd number of
> members not to exceed seven (7), each of whom shall be a natural
> person. Unless the certificate of incorporation fixes the number of
> directors, the number of directors shall be determined from time to time by
> resolution of the Board no reduction of the authorized number of Directors
> shall have the effect of removing any director before that director's term of
> office expires.
>
> 2.3 **Election, Qualification and Term of Office of Directors**.  Except as
> provided in section 2.4 of these bylaws, and subject to sections 1.2 and
> 1.9 of these bylaws, directors shall be elected at each annual meeting of
> stockholders, unless the stockholders appoint a member for a term longer

than one (1) year….

Two (2) of the directors shall be appointed by [Rasmussen/Mock Entity] (the "Rasmussen/Mock Directors"), two (2) directors shall be appointed by [Anderer/Bookman] (the "Anderer/Bookman Directors") and all remaining directors shall be elected by the majority vote of the stockholders (each, an "Independent Director").

. . . .

2.9 *Quorum/Voting*. **At all meetings of the Board, all of the [Rasmussen/Mock] Directors and [Anderer/Bookman] Directors, as well as a majority of the total authorized number of Directors shall constitute a quorum for the transaction of business**. If a quorum is not present at any meeting of the Board, than the directors present thereat, may adjourn the meeting from time to time, without notice other than announcement at the meeting, until a quorum is present.... (Emphasis added).

Thus, before business could be conducted at an Inaura Board of Directors' meeting, Anderer was required to be present along with Bookman, Rasmussen, another person of Rasmussen's and Mock's choice. If any of the four specifically identified individuals were not present, the Board lacked a quorum and could not lawfully conduct business.

27.    In or about August 2007, Holding also entered into a Stock Restriction Agreement with Inaura (the SRA"). Among other things, the SRA provided in relevant part that:

1.    **Repurchase Option**.
(a)    All shares of the Common Stock owned by the Stockholder pursuant to the CSPA [the Common Stock Purchase Agreement] (the **"Shares"**) shall be subject to this Agreement.
(i)    In the event that the Milestones (as defined below) have not all been accomplished or achieved or, in the alternative, waived or extended by the Board of Directors, within the 12-month period beginning on the date hereof (a **"Triggering Event"**) the Company shall from such time, have an irrevocable, exclusive option to repurchase (the **"Repurchase Option"**) any Shares which have not yet been released from the Repurchase Option (the **"Unreleased Shares"**), at a price per share equal to … (ii) [i]f a Liquidity Event (as defined below) has not occurred within the six (6)

months preceding the Triggering Event, an amount to be determined by the Board of Directors of the Company (in either case, the "Repurchase Price")….

(ii)     The Company may exercise its Repurchase Option, by providing written notice thereof to the Stockholder, as to any or all of the Unreleased Shares at any time after a Triggering Event. Within 10 days following the delivery of such a notice the Company shall tender payment to the Stockholder by any of the following methods, in the Company's sole discretion: (i) delivering to the Stockholder a check in the amount of the aggregate Repurchase Price, [Inaura] canceling an amount of the Stockholder's indebtedness, if any, to the Company equal to the aggregate Repurchase Price, (ii) [Inaura] issuing a promissory note in favor of the Stockholder providing for a term not to exceed three years and providing for no fewer than three (3) equal and regularly-scheduled installments (for example, a three-year note with three annual payments) … or (iv) any combination of (i), (Inaura), and (Inaura) such that the combined payment, cancellation of indebtedness and promissory note equals the aggregate Repurchase Price.…

2.     **Release of Shares from Repurchase Option; Vesting**.

(a)     Exhibit A includes a list of 15 performance objectives agreed upon by the Company and Stockholder, which may be modified, replaced or waived from time to time upon a majority vote of the Board of Directors ("**Milestones**"). The Board of Directors of the Company shall meet from time to time to determine whether the Milestones are being properly addressed.…

(b)     If the Board of Directors, by majority vote at a meeting or by unanimous written consent, determines that adequate progress has been made in furtherance of any particular Milestone, and so long as no Triggering Event has occurred, for each such Milestone achieved, such number of Shares representing 1/15th of the Shares shall be released from the Repurchase Option.…

(d)     Subject to the provisions of Section 1, the Shares have been released from the Company's Repurchase Option shall be delivered to the Stockholder at the Stockholder's request.…

13.     Governing Law. This Agreement shall be governed by and construed and enforced in accordance with the laws of the State of Utah as they apply to contracts entered into and wholly to be performed within such state by residents thereof, without regard to principles of conflicts of law. NOTE THAT THIS PROVISION HAS BEEN VIOLATED.

28.     Holding selected Anderer and Bookman as its directors. Rasmussen was

named the Chairman of the Board. Rasmussen delayed appointing a fourth member of

the Board as provided in Section 2.3 of the Bylaws, and a fifth independent director were not appointed until a later point in time, when Rasmussen appointed Mr. King Lee ("Lee"). Mr. Kipp Lassiter ("Lassiter") was then appointed as the "independent" director as provided in the Bylaws.

29.     In the Summer of 2008, discussions were held among Anderer, Bookman, and Rasmussen regarding the one year anniversary of the SRA and progress towards meeting the fifteen benchmarks/milestones. Inaura was underfunded and because of the lack of funding, the "clawback" provisions in paragraph 2 of the SRA would be eliminated, otherwise Anderer and Bookman intended to leave Inaura.

30.     On or about December 2, 2008, and without Anderer's then present knowledge or consent, Bookman, as Holding's registered agent, failed to make necessary annual report filings and allowed Holding to be administratively dissolved by the Utah Division of Corporations. As the registered agent, Bookman received the notice of such dissolution but failed to inform Anderer of the State of Utah's action.

31.     In or about  2009, Anderer was owed substantial funds for unpaid salary by Inaura, but Rasmussen, as Chairman of the Board was nevertheless demanding that Anderer perform substantial work for Inaura. Out of frustration, Anderer said that he would resign as the CTO of Inaura.

32.     Anderer, in fact, did not resign from Inaura, nor was any action taken to acknowledge any alleged resignation for over a year. Instead, in 2009 it was discovered that a company called Fusion-IO, Inc. ("Fusion") had been developing and marketing equipment which infringed upon patents held by Inaura. As an officer and director of Inaura, Anderer arranged for legal counsel to represent Inaura in pursuing Inaura's patent rights against Fusion.

33.     A settlement was reached between Inaura and Fusion by which certain funds were paid to Inaura and a cease and desist preventing further use of Inaura's patented technologies was entered into.

34.     Upon receipt of the settlement funds, Anderer insisted to the other officers and directors of Inaura that the proceeds be used to pay all amounts owed to Anderer, for wages and funding advances, to pay Inaura's creditors, and to pay Inaura's patent counsel so as to enable Inaura to finish various intellectual property filings, including completion of twenty-four patent applications.

35.     Anderer was led to believe by Rasmussen, Bookman and Mock that such funds were going to be used for those purposes.

36.     In 2010, Lee and Lassiter, as directors of Inaura each requested information from Bookman and Inaura regarding the business of the Company. The requested information was never provided. Accordingly, Lee and Lassiter resigned as directors of Inaura.

37.     As of the first half of 2010, Bookman was under extreme financial pressure. Bookman's paychecks were being garnished, and a vehicle he drove was repossessed. Bookman had previously lost his home pursuant to a foreclosure.

38.     Upon information and belief, Bookman met with Rasmussen wherein it was agreed between those two, Bookman and Rasmussen, that Inaura would re-impose the "clawback" provision of the SRA even though it had been earlier agreed that the benchmarks/milestones were abandoned, in consideration of retaining Anderer's and Bookman's services. Upon information and belief, it was further agreed between Bookman and Rasmussen to falsely assert that significant portions of the benchmarks had not been met, to cause Inaura to issue a Note to Bookman and

Anderer for the clawback shares and to agree that Rasmussen would agree to purchase at least a portion of Bookman's retained shares for $30,000.00, all in order to provide funds to Bookman to help him meet his financial needs.

39.     On or about August 4, 2010, a Board of Directors meeting was held among Rasmussen, Bookman, Mock and Turcotte (the "August 4 Meeting"). Anderer received no notice and was not present. Thus, pursuant to the Bylaws, no quorum was present and no lawful business could be or should have been attempted to be conducted.

40.     Despite the lack of a quorum at the August 4 Meeting, among other things, the minutes of that meeting reflect that:

       a.      Anderer was removed as the secretary of Inaura and replaced by Turcotte.

       b.      Lee's and Lassiter's resignations as directors were accepted, and David Mock was appointed as a director of Inaura.

       c.      Anderer had purportedly resigned as Inaura's CTO.

       d.      "[A]n internal audit of the Companies [sic] performance of the milestones outlined in Exhibit "A" [to the August 31, 2007 Stock Restriction Agreement] was made." The minutes reflect that the following ratings were issued and actions taken based upon those ratings:

          1.      Peter Bookman shall, for reasonable compensation, devote full-time effort as CEO for a suitable period of time to demonstrate continued commitment to work full time. The Board rated a 10.

          2.      Mike Anderer shall, for reasonable compensation, devote significant time and commitment as CTO for a suitable period of time to demonstrate continued commitment to the Company. The Board rated Anderer a 6 due to his time commitment in year one. The Board added that the 6 rating is not a rating of his personal performance, it is merely a rating of his efforts and Inaura Holdings [sic] collective efforts in reaching this milestone.

3.      Document Inaura's Vision & Direction. Rated at 2, only initial discussions were had, execution was ineffective. Those were not properly documented.

4.      Define & Implement Technology Plan of Action. Rated at 2, only initial discussions were had, execution was ineffective. Those were not properly documented.

5.      Define and Put Into Operation Internal and External Team per Business Plan. Rated at 0, no plan was defined or implemented. No business plan was actually produced. Peter was able to get engineers to execute and work for nominal funds, but, no formal plan produced upon which to award any points on this milestone.

6.      Assess Current Patent Portfolio As It Pertains To Current Technology Environment. Rated at 0. The Board quickly agreed that there was zero progress, no work toward this milestone. The BOD expressed much frustration over the lack of progress as to this milestone in particular.

7.      Formulate Strategic Patent Plan and Budget Per Technology Plan of Action. Rated at 0. The Board agreed that there was zero progress, no work toward this milestone.

8.      Formalize Technology Advisory Board Comprised Of Members With Significant Relevant Experience. Rated at 0. The Board agreed that there was zero progress, no work toward this milestone.

9.      Draft An Executive Summary Suitable For Distribution To Potential Investors And Strategic Partners. Rated a 5. Some progress was made here the performance was passable at best.

10.     Integrate And Implement Implied Work In Progress And Already Completed For the Inaura Concept From Peter Bookman and Mike Anderer's Companies. Rated at 0. The Board agreed that there was no business developed (Version 3, Inaura Key, simplified single sign on) and no strategic partnerships or other relationships were created, exploited as originally believed. No execution and no sales channels or other technologies were integrated into Inaura via any strategic relationships.

11.     Use Reasonable Best Efforts To Bring Sales From Pre-Existing Relationships With the Following Or Similar Companies, Resulting In Revenue or Purchase Orders Representing At Least $1,000,000.00. Rated a 0. No revenue, no sales, no monies generated by revenue.

12.    Draft Use Cases with Potential Parties [sic]. Rated a 0. None were done.

13.    Watch Updated Concept For Blackdog and K-9 Community. No follow through and interest level in the K-9 community dropped. Rated a 0.

14.    Develop Estimated Budget For 90-180 Days. Budget not formalized, discussed, but not formalized. Rated a 0. The Board notes that even today, a formal budget has not been produced.

15.    Design Plan and Engage Team To Execute Near Term and Long Term Means of Manufacturing Product Line at FMV. Rated a 5. Some progress was made as to this milestone but it has been less than anticipated.

As per the above evaluation, the Board concluded that the Company earned a total of 30 out of a possible 150 points, a grade of 20%. As a result of this exercise, the Company can and will opt to re-acquire the 80% equity interest of the Inaura Holdings, Inc. [sic] shares identified in the Stock Restriction Agreement. Rod Rasmussen motioned to act on the terms of the Stock Restriction Agreement and take back the Inaura Holdings, Inc. [sic] shares, it was seconded by David Mock. A vote was had and the Board was unanimous and,

**IT WAS HEREBY RESOLVED**, that the Company will exercise all of its' [sic] rights under the Stock Restriction Agreement to re-acquire the Inaura Holdings, Inc. [sic] shares which was triggered by Inaura Holdings, Inc. [sic] failure to meet their [sic] mutually agreed-upon milestones.

Peter Bookman addressed the Board. He expressed remorse over the historical record of the Company's lack of performance. Bookman still hopeful, much still needs to be done and the Board reiterated that it was grateful for his service to the Company. Much needs to be done, much work on the items listed in this minutes needs to be advanced. With the addition of new members of the Company in the weeks ahead and the formalization of a new go forward strategy, all remain confident….

The Board then discussed existing payables, liability to employees and founders for debts, accrued salary (if any) and sweat equity (ownership or stock options). In conjunction with this discussion, Peter Bookman  motioned that all co-founders inclusive of Peter Bookman, Mike Anderer and Rod Rasmussen should not be compensated with their accrued salaries, where they accrued salary elsewhere due to the absence of a performance of their duties as reflected in the failure to meet or exceed the 15 milestones set forth in the Stock Restriction Agreement. A vote was had and the Board was unanimous and,

**IT WAS HEREBY RESOLVED**, that the Company will not compensate or pay any accrued salaries to its' [sic] co-founders inclusive of Peter Bookman, Mike Anderer and Rod Rasmussen.

41.     Despite the requirement of more frequent board meetings to assess progress of Inaura towards the Milestones, this was the first and only such meeting, and it occurred more than a year after the execution of the SRA. In fact, the Milestones had not just been waived, but they had been eliminated.

42.     At no time did Anderer agree to waive his accrued salary.

43.     At no time did Anderer agree to the appointment of Turcotte as the "independent" director on the Inaura board.

44.     Lacking a quorum as defined in Inaura's Bylaws, all of the purported actions taken at the August 4 Meeting were null and void.

45.     Further, even under its own analysis, the purported Board of Directors determined that at least four of the fifteen goals had been met. Many of the goals that had not been met were the responsibility of Bookman.

46.     The SRA did not provide that the shares of Inaura owned by Holding would be subject to a clawback based upon a total points awarded under all benchmarks. For each benchmark receiving a score of "5" or better, Holding was entitled to retain one-fifteenth of its issued shares.

47.     On or about August 19, 2010, Rasmussen sent notice to Holding that Inaura had determined that a "Triggering Event" had occurred as defined in the SRA, and that Inaura was exercising "its option the repurchase all 1,604,262 of such Shares (the "Repurchased Shares") pursuant to Section 1(a) of the Agreement and hereby immediately repurchases such Shares."

48.     On or about August 27, 2010, Inaura issued a promissory note to Holding in the amount of $941,040 bearing interest at the rate of 0.55%, supposedly to facilitate the winding up of the affairs of Holding and to pay Holding for its shareholder interest in Inaura. At this

time, Rasmussen and Bookman were aware that Holding had been administratively dissolved by the State of Utah and was no longer an entity authorized to do business in Utah.

49.     In early September 2010, Inaura re-issued a Note to Anderer for $470,520 allegedly for his one-half share of the Inaura stock allocated to Holding and that was allegedly subject to the clawback provision of the SRA. The Note was backdated to August 27, 2010 and was signed by Rasmussen as the Chairman and CFO of Inaura.

50.     Upon issuing the Note to Anderer which became treasury stock of Inaura and after acquiring Bookman's shares, Rasmussen held the overwhelming majority of issued and outstanding shares of Inaura.

51.     The Note provided in relevant part:

1.      Payment.
   (a)   Debtor shall pay this Note in not less than three equal annual payments of principal and accrued interest, such that the entire principal amount of this Note and all interest accrued thereon shall be paid in full no later than the three-year anniversary of the Effective Date....
   (b)   Notwithstanding the foregoing, the then outstanding principal and accrued interest under this Note shall be immediately due and payable when, upon or after the occurrence of an Event of Default (as defined below), such amount is declared due and payable by Creditor or made automatically doing payable in accordance with the terms hereof.
2.      *Events of Default.* The occurrence of any of the following shall constitute an "Event of Default" under this Note:
   (a)   Failure to Pay. Debtor shall sell to pay any payment required under the terms of this Note on the date due and such payment shall not have been made within 10 (10) days of Debtor's receipt of Creditor's written notice to Debtor of such failure to pay....
3.      *Rights of Creditor upon Default.* Upon the occurrence or existence of any Event of Default (other than and Event of Default described in Sections 2(b) or 2(c) and at any time thereafter during the continuance of such Event of Default, Creditor may, by written notice to Debtor, declare all outstanding obligations payable by Debtor hereunder to be immediately due and payable without presentment, demand, protester any other notice of any kind, all of which are hereby expressly waived. Upon the occurrence or existence of any Event of Default described in Sections 2(b) and 2(c), immediately and without notice, all outstanding obligations payable by Debtor hereunder shall automatically become immediately due and payable, without presentment, demand, protest or any other notice of any kind, all of which are hereby expressly waived. In

addition to the foregoing remedies, upon the occurrence or existence of any Event of Default, Creditor may exercise any other right, power or remedy granted to it by this Note or otherwise permitted to it by law, either by suit in equity or by action at law, or both.…

8.  *Waivers*. Debtor hereby waives notice of default, presentment or demand for payment, protest or notice of nonpayment or dishonor and all other notices or demands relative to this instrument.

9.  *Governing Law*. This Note and all actions arising out of or in connection with this Note shall be governed by and construed in accordance with the laws of the State of Utah, without regard to the conflicts of law provisions of the State of Utah, or any other state.

The Note was executed by Rasmussen as Chairman and CFO of Inaura.

52.     At the time of the issuance of the Note, Inaura was insolvent.

53.     No payment has ever been made to Anderer by Inarua under the terms of the Note.

54.     Both before and after Anderer's forced departure from Inaura, Inaura continued to develop three internal projects. These internal projects were collectively known as "V3 Systems." One of the projects included a "virtual desktop accelerator" ("VDA"), which greatly increased the speed at which virtual desktops would operate.

55.     Upon information and belief, Defendant V3 was incorporated on or about September 3, 2010. The officers and directors of the V3 included Bookman, Turcotte, Rasmussen and Mock. Bookman is the CEO of V3. Turcotte is the COO and Executive Vice-president of sales at V3. Rasmussen is a cofounder and CFO at V3.

56.     In addition, V3 has hired a number of former employees of Inaura.

57.     Upon information and belief, all the V3 Systems projects that had been developed at Inaura were transferred to V3.

58.     In September and October 2010, V3 attended a trade show in San Francisco, California. In the words of V3's press release, the VDA was "a 1U-high rack-mounted appliance that serves as a virtual desktop accelerator" that allowed for virtual desktop

performance form a cloud-based environment." The VDA was one of the products developed by Inaura.

59.     On or about February 10, 2011, Rasmussen and Bookman appeared in person and Mock appeared by telephone for an alleged Board of Director's meeting of Inaura. Therein, the Board purportedly authorized conducting an emergency shareholders' meeting.

60.     The telephonic "emergency shareholders' meeting" was conducted on February 11, 2011. At that meeting, Anderer was told that Inaura had "forgotten" to pay payroll taxes from the time Anderer left the Board and that the IRS was demanding payment of $35,000 and that Inaura had no money. The only "shareholders" on the telephone call were Anderer and a friend of Rasmussen who also was an investor in Inaura.

61.     This was the first time that Anderer knew or reasonably could have known that all of the settlement proceeds from the Fusion IO dispute had been diverted from Inaura and that Inaura was in fact insolvent.

62.     During the course of the conversation, Anderer asked how V3 was doing. Anderer believes that it may have been Turcotte who said that Inaura had nothing to do with V3.

63.     Anderer disagreed and advised the attendees at the emergency shareholders' meeting that while Anderer was still with Inaura, his son had been contracted as a graphic artist to do the appliance design and logo work for the "virtual desktop accelerator" ("VDA") product launched by V3 in 2010. Further, the copyrighted graphics had won an award at the VMworld 2010 trade show held at the Moscone Center in San Francisco, California.

64.     Anderer also indicated that he had emails in his possession dating back to February 2010 about the appliance that became "VDA" and that Rasmussen had reserved the "V3 Systems" name on or about April 1, 2010 while with Inaura.

65.     Anderer also indicated during this call that it appeared to him that V3 had used Inaura's employees, money, resources, and intellectual property to build the V3 System products and then had spun the products out to a new company owned by all of them except for Anderer and some of the smaller shareholders of Inaura.

66.     At no time prior to V3's formation had any of the individual defendants advised Anderer that V3 had been launched. At no time had any of the individual defendants advised Anderer of any conflict of interest between their duties as officers and directors of Inaura. At no time had any of the individual defendants advised Anderer that Inaura's products and intellectual property were being diverted to or being seized by V3.

67.     On or about March 3, 2011 another meeting of the shareholders of Inaura was held. The agenda items included:

1)     Review of the current status of the company.
2)     "Acknowledgement of the resignation of Peter Bookman & Appointment of New Officer(s)."
3)     Nomination of additional members of the Board of Directors.
4)     Review of debt conversion of existing Inaura promissory note.
5)     Financial Status of Inaura, next operational steps, financing activities.
6)     Review of existing Cap Table, voting breakdown.
7)     Open discussion of additional actions or items of business.

68.     At this meeting,it was finally admitted by the defendants and acknowledged that approximately seventy per cent (70%) of the settlement funds that Inaura had received from Fusion had actually been used to pay employees and contractors on behalf of V3, rather than for the purposes that had been represented to be intended . These funds had been used prior to paying Anderer the salary due to him or to reimburse to him any other monies he had loaned to Inaura.

69.     Through improper self-dealing, defendants, on behalf of V3, agreed  to provide Inaura a note for $700,000, and further to provide Inaura  with a 10% ownership interest in

V3. Anderer never agreed to this allocation of shares or compensation. Holding never agreed to this allocation of shares or compensation. The offer of a note and shares in V3 was done after-the-fact in an effort to cover up the theft of Inaura's assets, intellectual property, trade secrets, and patent rights.

70.     Upon information and belief, V3 successfully raised millions of dollars from investors to continue to pursue the business of V3. At no time, however, did V3 or its officers or directors disclose to those investors (a) the liabilities owed by V3 to Inaura, (b) the liabilities of V3 to Anderer, (c) Anderer's ownership interest in Inaura, (d) Inaura's ownership interest in V3, or (e) Inaura's products having been diverted by one or more of the individual defendants to V3.

71.     Upon information and belief, the investors who purchased stock in V3 believed that it would be improper for any of their funds to be directed towards payments  to Inaura.

72.     Anderer has been assigned all rights, claims, and causes of action from the artists who developed copyrighted material to promote the VDA that they may have against Inaura or V3 for payments of amounts due them for creation of the appliances and marketing materials and violation of their copyright interests in those works and now is the real party in interest with respect to those claims.

73.     The acts, transactions and occurrences complained of herein affect interstate commerce by, among other things, multiple uses of the United States mails and interstate wires (including telephone and internet email service), and affecting and attempting to affect the interstate transaction of business, including without limitation sales of securities, the interstate transfer of funds. The individual defendants have conspired with one another to obtain the funds, resources and assets of Anderer, Holding, and Inaura without paying fair value for the same; to violate fiduciary duties, to steal corporate opportunities, and to obtain

new funds from investors for the benefit of V3 and its officers and directors, by falsely overstating the value of V3 System's assets and by concealing the sources of such assets and the significant liabilities owed. One or more of the individual defendants have engaged in similar tactics and engaged in similar practices in the past. Anderer, Inaura, and others have been injured by the conduct described in this Complaint.

74.    Plaintiff is informed, and therefore believes, that Mock, Rasmussen and Turcotte have conspired and engaged in a pattern of wrongful acts by which they have enriched themselves at the expense of others in other start-up companies, whose assets have been stripped by them to the detriment of shareholders, members, owners, investors and/or holders of intellectual property. Plaintiff is informed and therefore believes that such other situations also affected commerce and involved the use of the United States mails and interstate wires, the transport of money in commerce and other acts, the investigation of which may lead to the proof of other claims against them in this action and Anderer reserves his right, upon the conduct of discovery, to seek leave from the Court to amend his complaint one or more, and as many as necessary times so that all claims he may have but which he is not currently able to allege for a lack of presently-available proof may be added at a future time.

### COUNT I
### (Multiple Breaches of Fiduciary Duties
### By Rasmussen, Bookman, Mock and Turcotte)

75.    Plaintiff incorporates by reference all of the allegations of this Complaint as though they were set forth in their entirety hereat.

76.    Inaura was a closely-held corporation. As such, each shareholder, director and officer of Inaura owed a fiduciary duty to each of the shareholders of Inaura. Such fiduciary duties included, without limitation, the duty to disclose all material information that would affect the value of Anderer's investment, to act in accordance with the requirements of law, to act

fairly towards Anderer and not unjustly, unfairly or oppressively, to not take any action that would unjustifiably impair the value of his investment or enhance the value of any other shareholder's investment at his expense, to refrain from usurping opportunities that the company could acquire to increase the value of Anderer's investment, to act and to cause the company to act lawfully, and to refrain from looting the assets of the company.

77.    Rasmussen, Bookman, Mock and Turcotte breached their fiduciary duties to Anderer and Holding by, without limitation, engaging in one or more of the following acts which were ultimately designed to force Anderer from any ownership or management position with Inaura and to allow those defendants and V3 to obtain the intellectual property, trade secrets, and patent rights owned and developed by Inaura and Holdings. Those acts included:

a.    Withholding material information from Anderer about the actions and intention of the company's directors and officers to loot all of the assets of Inaura;

b.    Conspiring to deceive and deceiving Anderer as to the true intentions of the company, its officers and directors concerning the clawback, the milestones and judgment of the milestone performances, the purchase of stock and the apparent unauthorized spinout of V3 through the unlawful form of the theft of assets from Inaura and Holding;

c.    Conducting the August 4 Meeting without the quorum required by Inaura's Bylaws;

d.    Appointing new directors in violation of Inaura's Bylaws;

e.    Reinstating the benchmarks/milestones in the SRA that were, by agreement to have been abandoned by Inaura;

f.    Conducting the supposed evaluation of the benchmarks/milestones and determining that Holding was only entitled to retain 20% of the Inaura shares issued to

it;

g.      Agreeing that Anderer was not to receive any back salary or other compensation for work previously performed and agreed to be paid;

h.      Failing to use settlement proceeds from the Fusion settlement to pay amounts owed to Anderer;

i.      Failing to use settlement proceeds from the Fusion settlement to pay Inaura's patent counsel to secure Inaura's patent rights and pending applications;

j.      Failing to use settlement proceeds from the Fusion settlement to pay payroll taxes;

k.      Allowing Inaura's intellectual property, trade secrets, and other intellectual property to be transferred to V3 without just compensation or any reasonably equivalent consideration;

l.      Illegally squeezing Anderer out of his ownership and management positions with Inaura;

m.      Taking board action without interested directors recusing themselves;

n.      Taking board action when directors had conflicts of interest because of their ownership and managerial positions with V3;

o.      Allowing Bookman to convey the ownership interests allocated to him after he allowed Holding to be administratively dissolved to Rasmussen;

p.      usurping to their own benefit all of the benefits and profits belonging to Inaura, Holding and Anderer in the form of illicit gross proceeds of operations stolen by V3.

78.      As a result of the foregoing breaches of fiduciary duties, Anderer and Holding have been injured and have suffered damages in an amount to be proven at trial, without

limitation for Anderer's unpaid compensation and back salary, conversion of his investment interest in Inaura, and other losses. In addition, Anderer is entitled to equitable remedies in the form of disgorgement and restitution of all gross sums taken in by V3, all salaries, compensation and other benefits received by defendants from V3, the removal of Bookman as a member and manager of Holding and the appointment of a receiver to operate and manage V3, to account for the assets of Inauara and for the return of all assets to Inaura and the appointment of management and a Board of Directors not owned or controlled by the thieves who stole the assets of the company.

79.     Finally, Anderer is entitled to an award of punitive damages against each of the defendants, for their respective breaches of fiduciary duties, inasmuch as the same were committed willfully, maliciously intentionally and are fraudulent conduct, or conduct that manifests a knowing and reckless indifference toward, and a disregard of, the rights of others.

**Count II**
**(Breach of Fiduciary Duties Owed by Bookman to Anderer with Respect to Holding)**

80.     Plaintiff incorporates by reference all of the allegations of this Complaint as though they were set forth in their entirety hereat.

81.     In addition to the foregoing and at times as an adjunct to the same, Bookman violated additional fiduciary duties owed to Anderer as a member of Holding in connection with the operations of Holding, including without limitation:

    a.     Allowing Holding to be administratively dissolved;

    b.     Agreeing to reinstate the clawback provisions of the SRA;

    c.     Agreeing that the benchmarks had not been met;

    d.     Agreeing to conduct the analysis when there had been no prior board meetings addressing whether the benchmarks were being met;

e.      Agreeing to take accept one-half of the amounts offered to Holding for Holding's Inaura stock interests, thereby diluting the managerial and voting control that Holding held collectively;

f.      Agreeing to sell his interests in Inaura to Rasmussen and to vote that no back pay would be provided to Anderer in exchange for being given a management position in V3; and

g.      Agreeing to allow Inaura's intellectual property and trade secrets to be transferred to V3 without fair compensation.

82.     Anderer was damaged by Bookman's foregoing breaches of fiduciary duties, in an amount to be proven at trial, including without limitation, for Anderer's unpaid compensation and back salary, conversion of his investment interest in Inaura, and for the removal of Bookman as a member and manager of Holding and the appointment of a receiver to operate and manage Holding, to account for the assets of Holding and for the return of all assets to Holding and the appointment of management not owned or controlled by defendants.

83.     Finally, Anderer is entitled to an award of punitive damages against Bookman for his breaches of fiduciary duties, inasmuch as the same were committed willfully, maliciously intentionally and are fraudulent conduct, or conduct that manifests a knowing and reckless indifference toward, and a disregard of, the rights of others.

## COUNT III
### (Breach of Contract by Inaura)

84.     Plaintiff incorporates by reference all of the allegations of this Complaint as though they were set forth in their entirety hereat.

85.     The clawback provisions of the SRA were abandoned.

86.     Even if the SRA had been in place, the SRA provided in relevant part that:

    a.      Periodic reviews were to be held and none were held;

    b.      Benchmarks were to be evaluated separately and for each benchmark met with a score of "5" or better, Holding was to entitled to be vested with one-fifteenth of the Inaura stock– this provision was breached.

    c.      Inaura breached the implied covenant of good faith and fair dealing in conspiring with Bookman to cook the evaluation and eliminate Anderer without paying him and to strip him of all the value of his investment and work.

87.     Such breaches ahvge been the caus-in-fact and legal cause of damages to Anderer for which he is entitled to relief under all legal and equitable theories available.

## COUNT IV
### (Breach of Note by Inaura)

88.     Plaintiff incorporates by reference all of the allegations of this Complaint as though they were set forth in their entirety hereat.

89.     Anderer is the holder of a Note by which Inaura promised to pay the Note indebtedness.

90.     Inaura has failed and refused to pay.

91.     Anderer is entitled to all sums owed under the Note as damages, together with interest, attorney fees and costs.

## COUNT V
### (Violation of Federal Securities Laws)

92.     Plaintiff incorporates by reference all of the allegations of this Complaint as though they were set forth in their entirety hereat.

93.     The SRA was a contract involving the purchase and sale of Inaura stock.

94.     Inaura, Bookman, and Rasmussen violated Section 10(b) of the Securities

Exchange Act of 1934, 15 U.S.C. § 78j, and Rule 10b-5 promulgated thereunder, by directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange, employing devices, schemes, or artifices to defraud, making untrue statements of material facts or to omitting to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, and engaging in acts, practices, and courses of business which operated or would operate as a fraud or deceit upon any person.

95.    In addition to all of the foregoing, Inaura, Bookman, Rasmussen and Mock specifically represented, in exchange for the sale of stock to Inaura, that the Note would be paid when in fact they had the intent to divert the monies received from Fusion IO to V3, their new business, so as to leave Inaura without any means to pay the Note.

96.    Anderer acted in ignorance of the true state of affairs because, even though a duty to disclose the true state of Inaura's affairs and defendants' intentions existed, defendants not only failed to disclose but also affirmatively lulled Anderer into believing that the Note would be paid.

97.    Defendants intended to induce Anderer to rely and sell his stock Anderer was so induced and reasonably and justifiably relied on the representations that he would be paid on the Note. Defendants knew their plans to loot all of the assets of Inaura at the time the representations were made.

98.    As a result, Anderer has been in fact damaged and that damaged was in fact caused by the misrepresentations about Inauara's ability to pay the Note, in that all of the assets of Inaura were stripped by the fraudsters while they lulled Anderer.

99.    Bookman, Rasmussen and Mock are all liable as control persons. Bookman, Rasmussen and Mock "knowingly committed" the foregoing acts. Inaura, Bookman,

Rasmussen and Mock acted with an intent to deceive or were reckless.

100.    Bookman and Rasmussen benefited from their unlawful actions in a concrete way; they engaged in deliberately illegal behaviour; and they knew facts or had access to information suggesting that their statements were untrue.

## COUNT VI
### (Violation of State Securities Laws, UTAH CODE ANN. § 61-1-22)

101.    Plaintiff incorporates by reference all of the allegations of this Complaint as though they were set forth in their entirety hereat.

102.    For the same reasons as set forth in the prior Count, defendants violated the Utah Secuities laws and are liable to Anderer under UTAH CODE ANN. § 61-1-22 for treble damages for their intentional fraud and also for direct and indirect insider liability under section 61-1-22(4)(c) and/or for recision, restitution and gisgorgement.

103.    On any award of damages, Anderer is entitled to 12 % interest.

104.    Anderer is also entitled to all his reasonable attorneys fees costs and expenses.

## COUNT VII
### (Common Law Fraud, Fraudulent Non-disclosure, and Conspiracy to Defraud by Anderer Against All Defendants).

105.    Plaintiff incorporates by reference all of the allegations of this Complaint as though they were set forth in their entirety hereat.

106.    For all of the reasons in Counts V and VI, above, defendants are also liable to Anderer for the fraud described above and for all damages and equitable remedies to which he may be entitled thereby.

## COUNT VIII
### (Violation of Utah's Uniform Trade Secrets Act Against Rasmussen, Bookman, and V3 Derivatively on Behalf of Inaura)

107.    Plaintiff incorporates by reference all of the allegations of this Complaint as

though they were set forth in their entirety hereat.

108.    V3 acquired Inaura's trade secrets and intellectual property through improper means. It induced violations of duties of confidentiality and loyalty by Rasmussen, Bookman, Mock, and Turcotte.

109.    V3 knew that Inaura's trade secrets had been obtained by improper means, misappropriating them from Inaura by paying off Bookman and the remaining directors of Inaura and inducing them to breach their fiduciary duties owed to Inaura and Anderer.

110.    The trade secrets included, inter alia, all of the intellectual property and the VDA which Inaura had developed.

111.    Anderer, as the shareholder of a closely-held corporation, is entitled to all such available remedies against V3, including disgorgement, restitution, damages, constructive trust and the appointment of a receiver as is appropriate.

112.    Willful and malicious conduct entitles Inaura/Anderer to punitive damages.

**COUNT IX**
**(Fraudulent Transfer of Inaura Assets to V3)**

113.    Plaintiff incorporates by reference all of the allegations of this Complaint as though they were set forth in their entirety hereat.

114.    The transfer of Inaura's intellectual property, trade secrets and other assets was made to an insider while Inaura was insolvent or was done with the actual intent to hinder, delay or defraud Anderer as a creditor, to prevent him from collecting the amounts due him from Inaura and/or Holding.

115.    Inaura did not receive a reasonable equivalent consideration for the transfer.

116.    The remaining assets of Inaura were unreasonably small in relation to the business of Inaura and the amounts owed to Anderer.

117.    The transfers were made to insiders under the control of the individual defendants.

118.    The transfers were of substantially all of the assets of Inaura.

119.    Inaura is entitled to recover the intellectual property and all other assets of Inaura that were fraudulently transferred to V3, to have a receiver appointed to take over all of V3's assets and business operations for the benefit of Anderer and to have an injunction against all other transfers.

## COUNT X
### (Copyright Violations)

120.    Plaintiff incorporates by reference all of the allegations of this Complaint as though they were set forth in their entirety hereat.

121.    V3 utilized copyrighted materials without any license in the promotion of its products.

122.    The artists of those copyrighted materials were never paid and the works were not made for hire.

123.    Anderer is the assignee of all such claims pursuant to written agreements.

124.    Anderer entitled to damages under 17 U.S.C. § 504(c)(1) between $750 and $30,000 for each copyright violation.

125.    Infringement by V3 on copyrighted material was willful, thus increasing potential statutory damages to $150,000 for each violation.

126.    Alternatively, Anderer entitled to recover actual damages and any profit.

127.    V3 should be enjoined from any further use of the copyrighted materials.

## COUNT XI
### (Miscellaneous Breaches of Contract)

128.    Plaintiff incorporates by reference all of the allegations of this Complaint as

though they were set forth in their entirety hereat.

129.    In addition to the more specific contract breaches set forth in Counts above, the factual allegations contain multiple other allegations of breaches of contract, all of which caused damages to Anderer and for which he is entitled to all such legal and equitable relief as the proof at trial may show.

## COUNT XII
### (Conversion)

130.    Plaintiff incorporates by reference all of the allegations of this Complaint as though they were set forth in their entirety hereat.

131.    Defendants converted to their own benefit all of the assets of Inaura.

132.    Anderer has been damages by such conversion and is entitled to judgment for damages against defendants.

133.    Anderer is entitled to an award of punitive damages against each of the defendants, for their conversion, inasmuch as the same were committed willfully, maliciously intentionally and are fraudulent conduct, or conduct that manifests a knowing and reckless indifference toward, and a disregard of, the rights of others.

## COUNT XIII
### (Civil Conspiracy)

134.    Plaintiff incorporates by reference all of the allegations of this Complaint as though they were set forth in their entirety hereat.

135.    Each of the defendants, along with other, currently unknown conspirators, acted in concert, by way of a combination of two or more persons.

136.    The conspiracy had the object of looting the assets of Inaura and leaving Anderer unpaid for his services, intellectual property and other valuables contributed to Holding and Inauara.

137.    There was a meeting of the minds between each combination of two or more conspirators as to the object of the conspiracy and/or the courses of action by which it would be carried forward.

138.    Each of the conspirators undertook one or more unlawful, overt acts in furtherance of the conspiracy.

139.    The acts of one or more conspirators in furtherance of the object of the conspiracy have been the cause-in-fact and legal cause of damages to Anderer, in a sum to be proven based on the evidence at trial.

140.    Anderer is entitled to an award of punitive damages against each of the defendants, for their conspiracy, inasmuch as the same were committed willfully, maliciously intentionally and are fraudulent conduct, or conduct that manifests a knowing and reckless indifference toward, and a disregard of, the rights of others.

**WHEREFORE,** Anderer demands judgment in his favor and against defendants, jointly and severally to the extent allowed by law, as follows:

A.    For all forms of damages as may be allowed, in such sums as may be proven at trial;

B.    For all equitable remedies as may be allowed, in the form of, without limitation, disgorgement, restitution, constructive trust, turnover, the removal of members, managers, officers and directors, the appointment of one or more receivers, appropriate accountings, for the return of all assets to Inaura, for injunctive relief, and for the appointment of management and a Board of Directors not owned or controlled by the defendants;

C.    For each and every remedy allowed by statute;

D.    For all other relief to which the proof may show entitled as allowed by Rule 54(c);

E.       For an award of punitive damages against each of the defendants, for their

respective wrongful acts, inasmuch as the same were committed willfully, maliciously

intentionally and are fraudulent conduct, or conduct that manifests a knowing and reckless

indifference toward, and a disregard of, the rights of others;

F.       For all of Anderer's reasonable attorneys' fees, costs and expenses as may be

allowed at law, in equity, by contract, statute, rule, inherent power of the Court or otherwise.

E.       For prejudgment interest at the maximum applicable rates; and

F.       For all such other and further relief as the Court deems just, equitable and

proper in the premises.

DATED this 11th day of February, 2013.

PETERS | SCOFIELD
*A Professional Corporation*


/s/ David W. Scofield_____
DAVID W. SCOFIELD
Attorneys for Plaintiff